AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT

5/20/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

5/20/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___tsn___ DEPUTY

United States of America

v.

ARISTEO GOMEZ,
 aka "Teo"
 aka "Shooter"
 aka "Pedro"
 aka "Pedro De Pacas,"

        Defendant

Case No.    2:24-mj-02931-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 17, 2024 in the County of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

/s/
*Complainant's signature*

Daniel Olgren, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        May 20, 2024

*Judge's signature*

City and state:   Los Angeles, California

Hon. Stephanie S. Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander H. Tran x0758

## AFFIDAVIT

I, Daniel Olgren, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Aristeo GOMEZ ("GOMEZ") for a violation of 21 U.S.C. §§ 841(a)(1): Distribution of a Controlled Substance.

2.    This affidavit is also made in support of applications for warrants to search 12955A Little Tujunga Canyon Road, Sylmar, CA 91342 (the "SUBJECT PREMISES") as described more fully in Attachment A-1; a 2007, Gray Chevrolet Tahoe, bearing California license plate 7NDH235 and Vehicle Identification Number ("VIN") 1GNFK13087R123208 (the "SUBJECT VEHICLE") as described more fully in Attachment A-2; and the persons of GOMEZ and Ana Gabriela Velasquez ("VELASQUEZ") as described more fully in Attachments A-3 and A-4, respectively.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4 and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), in Northridge, California, and I have been so employed since July 2010. I am currently assigned to HSI Ventura-Northridge, where I am responsible for investigating fraud schemes, narcotics smuggling, money laundering, illegal gambling, firearms violations, immigration crimes, human smuggling, transnational organized crime, and various other violations of immigration and customs law.

6.   Since becoming a Special Agent in July 2010, I received formal training at the Criminal Investigator Training Program and ICE Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC") in Brunswick, Georgia. This training included classes concerning organized crime, drug crimes, money laundering, financial crimes, firearms crimes, and human trafficking.

7.    Through my training, experience, and consultation
with other experienced agents and law enforcement officers, I
have knowledge of the operation methods used in narcotics
smuggling, firearms trafficking, marriage fraud schemes, human
trafficking, and financial crimes, specifically, illegal
gambling, and money laundering.  I am also familiar with how
criminal organizations use digital devices and financial
institutions to facilitate and conceal their crimes.

8.    During my time at HSI, I have investigated crimes
involving narcotics smuggling, firearms violations, illegal
gambling, and money laundering.  I have participated in many
aspects of criminal investigations, such as, but not limited to,
reviewing evidence, interviews, the issuance of subpoenas,
analyzing cellphone data and GPS tracking records, conducting
physical and electronic surveillance, and executing search and
arrest warrants.

9.    I am familiar with the facts and circumstances of this
investigation through my own participation and through
discussions with other law enforcement officers involved with
this investigation.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

10.  HSI is currently investigating a drug trafficking
organization ("DTO") operating in the Los Angeles area.  In
November 2023, HSI seized approximately 200 pounds of
methamphetamine wrapped in brick-shaped packages, drug
paraphernalia (such as packaging materials), and multiple
firearms during a search of a residence in Northridge, CA.  From

that search, investigators recovered digital devices and discovered evidence confirming the existence of large-scale narcotics trafficking perpetrated by the DTO and its members, including GOMEZ and VELASQUEZ.

11.  Additionally, since January 2024, HSI and the Los Angeles Police Department ("LAPD") have observed GOMEZ and VELASQUEZ engage in several suspected drug transactions using the SUBJECT VEHICLE to travel to those deals.  For instance, on January 17, 2024, GOMEZ caused a parcel to be shipped by UPS that contained approximately 1.09 kilograms of presumptive fentanyl.  Furthermore, on May 13, 2024, GOMEZ and VELASQUEZ traveled in the SUBJECT VEHICLE from the SUBJECT PREMISES to broker a drug deal that resulted in law enforcement's seizure of approximately 1.07 kilograms of presumptive methamphetamine. Thus, for all the reasons described herein, there is probable cause to believe that GOMEZ has committed a violation of 21 U.S.C. § 841(a)(1) and that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES, SUBJECT VEHICLE, and the persons described in Attachments A-1, A-2, A-3, and A-4.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Law Enforcement Seizes 200 Pounds of Methamphetamine and Multiple Firearms During Federal Arrest and Search**

13.  On November 15, 2023, investigators with the HSI, as well as investigators with the LAPD, executed a federal arrest and federal search warrant at 9710 Zelzah Avenue, Apartment 107, Northridge, CA ("the ZELZAH RESIDENCE").[1]  The ZELZAH RESIDENCE was identified as the primary residence of Michael Sanchez ("SANCHEZ"), who was previously indicted for federal weapons and narcotics charges and had an active federal arrest warrant.  See United States v. Michael Sanchez, Case No. 23-CR-299 (C.D. Cal.).

14.  In the ensuing arrest of SANCHEZ and search of the ZELZAH RESIDENCE, investigators located four illegally possessed firearms (including semi-automatic and stolen guns) and approximately 200 pounds of methamphetamine wrapped in brick-shaped packages, and drug paraphernalia (including packaging materials) consistent with large scale drug distribution.  As discussed below, agents also seized multiple digital devices inside the ZELZAH RESIDENCE.

**B.    SANCHEZ's Digital Devices Contain Evidence of Bulk Narcotics and Weapons Trafficking**

15.  HSI SA Jerome Salvador informed me that LAPD detectives conducted an initial analysis of the digital evidence recovered from the digital devices seized from SANCHEZ's

---

[1] On November 14, 2023, the Honorable Magistrate Judge Patricia Donahue issued a warrant to search the ZELZAH RESIDENCE.  See Case No. 2:23-mj-05868 (C.D. Cal. Nov. 14, 2023).

residence and discovered evidence that SANCHEZ and others are likely engaged in bulk narcotics and weapons trafficking.

16.   For example, HSI SA Salvador informed me that while he was analyzing an Apple iPhone XR with IMEI 356834111455210, and phone numbers[2] ending in "2890" and "7177", LAPD detectives discovered numerous conversations between SANCHEZ and six different cell phone numbers and aliases appearing to be facilitating and orchestrating the bulk trafficking of narcotics and firearms.   These phone numbers and aliases were: "Pedro" (ending in 1458), "Shooter" (two numbers, one ending in 6669 and one ending in 4692), "Pedro De Pacas" (ending in 3733), "TE0GZ" (ending in 8005), and "Teo" (ending in 7666).

17.   While reviewing these conversations and based on his training and experience, LAPD Detective Kaminski noticed similarities in communications from the six phone numbers and aliases.   These similarities included a unique writing style where periods were intermittently misplaced in messages, as well as the review of voice messages which sounded remarkably identical and appear to have been coming from the same individual, even though the messages were from several different phone numbers and phones.

18.   Based on my training and experience and discussions with investigators familiar with drug investigations, I know that narcotics traffickers will commonly utilize phone numbers not formally associated or linked to them.   These phones,

---

[2] The phone with IMEI 356834111455210 appeared to have two different phone numbers associated with it based on the data extracted by the Cellebrite software.

commonly referred to as "burner phones[3]", assist in avoiding detection from law enforcement.  Additionally, narcotics traffickers will commonly "drop[4]" or switch out their "burner phones" on a regular basis to avoid detection.  Based on these similarities, based on his training and experience and knowledge of the current investigation, HSI SA Salvador informed me that he believes all six aliases: Pedro, Shooter, Pedro De Pacas, TE0GZ, and Teo belong to the same individual -- a high-level target within a drug trafficking organization, namely, GOMEZ. In short, investigators believe SANCHEZ was conversing with GOMEZ, who is using multiple burner phones under different aliases such as Pedro, Shooter, Pedro De Pacas, TE0GZ, and Teo. In addition, as explained below in section IV.D., an LAPD Confidential Informant separately recalled that GOMEZ used at least four of the above phone numbers.

19.  HSI SA Salvador informed me that SANCHEZ's digital devices contained conversations where SANCHEZ and GOMEZ have engaged in open and blatant coded language orchestrating the sale of large-scale narcotics and firearms.  Both parties were negotiating prices, quantities, types, and orchestrating pick up/drop offs of narcotics, including apparent methamphetamine, fentanyl, heroin, and cocaine.

---

[3] Based on my training and experience, I know that the term "Burner Phone" refers to the use of inexpensive or sometimes prepaid mobile phones that are designed for temporary use and can be discarded easily; they also allow users to be anonymous by not requiring contracted service plans.

[4] Based on my training and experience, I know that the term "drop" is the processing of disconnecting the current phone number assigned to a cell phone, so that it is no longer active.

20.  Below are excerpts from several text and audio conversations that were described to me:

a.  On or about January 13, 2023, at 8:10 p.m., contact "Pedro" messaged SANCHEZ seemingly about an incoming narcotics shipment.

       i.  PEDRO: What you doing

      ii.  PEDRO: Gee

     iii. SANCHEZ: What up gee

      iv.  PEDRO: We might hut today. Your going to need that right

      v.  SANCHEZ: What time are they landing gee

      vi.  SANCHEZ: So I could be around

     vii. PEDRO: In a few hours

    viii. SANCHEZ: Okay gee

      ix.  SANCHEZ: Just let me know when there 30 away

      x.  PEDRO: K

      xi.  PEDRO: A gee. There like 40. Minutes away

     xii. SANCHEZ: Okay where do I meet them at

    xiii.   PEDRO: They going to drop them off at Ana's just grab them from there.

    xiv. SANCHEZ and GOMEZ then began exchanging voice messages discussing how what they were expecting to be dropped off at "Ana's" may be coming in "tires[5]."

_____

[5] Based on my training, experience and discussions with LAPD Detective Kaminski I know that narcotics traffickers, especially those who transport illicit narcotics across the Mexico-United States border, will commonly secrete the narcotics in tires to conceal them from potential law enforcement discovery.

b.   On or about July 29, 2023, at 7:53 p.m., contact "Pedro De Pacas" messaged SANCHEZ inquiring if SANCHEZ needed kilos of cocaine for a potential buyer.

i.   PEDRO DE PACAS: Have they asked you for birds[6]

ii.  SANCHEZ: Yea gee

iii. PEDRO DE PACAS: Cash Money

iv.  SANCHEZ: Yea gee

v.   PEDRO DE PACAS: How Manny you need

vi.  SANCHEZ: Give me 5 mins ima call

vii. PEDRO DE PACAS: Yo

viii.    PEDRO DE PACAS then sent a nine second video of a hand sifting through a bag appearing to contain "bricks", or narcotics packaged in kilograms of narcotics.

c.   On or about July 21, 2023, at 11:23 p.m., contact "Teo" messaged SANCHEZ inquiring on when he will have cash ready from a transaction.

i.   TEO: What. Time would you have the cash for the chicken

ii.  TEO: Maybe I could ask for the two. Fernando[7] ones. You cash that one out

---

[6] Based on my training and experience, I know that the term "Birds" is representative of the code word "chicken", which translates to a kilogram of narcotics, or a "brick", typically referring to cocaine.

[7] Based on my training and experience, I know that the term "Fernando" is a code word to represent the narcotic, Fentanyl.

iii. TEO: And asked them by when would they grab that Moreno[8] to gee.

d. On or about March 31, 2023, at 1:55 a.m., contact "Pedro" sent an audio voice recorded message to SANCHEZ.[9] The voice recording states: "Hey gee, um, I was talking to Chillon[10], right, and then he wants to offer me for the eight rifles we send. Or was nine he kept wanting cause he took them inside, he wants to offer us 1,500 skittles[11] fool, but I don't know if you want to do it or not."

**C. GOMEZ is in a Relationship with VELASQUEZ**

21. HSI SA Salvador also informed me of several conversations recovered from SANCHEZ's digital devices in which GOMEZ references "Ana" and the phone number ending in 4692, a cellular telephone issued by T-Mobile and subscribed to VELASQUEZ.

22. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, VELASQUEZ is the current girlfriend or cohabitant of GOMEZ. In reviewing SANCHEZ's digital devices, digital evidence shows that GOMEZ has provided

---

[8] Based on my training and experience, I know that the term "Moreno" is Spanish for "dark" and typically refers to the narcotic, Heroin.

[9] The audio recordings are primarily in English. Some of the audio recordings on the digital devices are in Spanish, but the conversations described herein are in English.

[10] Based on my training and experience, I know that the term "Chillon" is a nickname in Spanish meaning "cry baby".

[11] Based on my training and experience, I know that the term Skittles is common drug vernacular for illicit pills.

VELASQUEZ's phone number to his co-conspirators involved in the drug trafficking organization in order to coordinate suspected drug sales.

23.   Below are excerpts from several text and audio messages from SANCEHZ's digital devices, referring to VELASQUEZ:

a.   On or about July 27, 2023, during a conversation between SANCHEZ and contact "Pedro De Pacas", GOMEZ stated "What. Up gee. I was inside the clinic with ana."

b.   On or about July 16, 2023, during a conversation between SANCHEZ and contact "Teo", GOMEZ stated, "Drop them off at Ana moms."

c.   On or about March 23, 2023, during a voice message conversation between SANCHEZ and contact "Pedro", GOMEZ stated, "I'm going to text you Ana's number fool."  This voice message is followed-up with a text message listing VELASQUEZ's phone number.

d.   On or about January 14, 2023, during a conversation between SANCHEZ and contact "Pedro", GOMEZ stated, "They going to drop them off at Ana's just grab them from there."

e.   On or about January 5, 2023, during a conversation with contact "Shooter", GOMEZ stated, "If not Ana could hit him up."

24.   HSI SA Salvador informed me that investigators utilized law enforcement databases LexisNexis and Leads Toolbox using LAPD resources, conducted an inquiry into VELASQUEZ's phone number that is suspected to be "Ana's" phone number

through a series of voice and text messages with SANCHEZ on
March 23, 2023.  Specifically, Detective Kaminski has listened
to video messages between GOMEZ and SANCHEZ where GOMEZ informed
SANCHEZ that suspected drug products or cash will be dropped off
at "Ana's" home.  Investigators discovered that VELASQUEZ's
phone number is registered to VELASQUEZ with a DOB in 1988, and
a specific residential address in San Fernando, CA (the
"VELASQUEZ address").

25.  Furthermore, HSI SA Salvador informed me that based on
records of international border crossings for VELASQUEZ from the
United States into Mexico, on September 20, 2023; August 21,
2023; January 4, 2023; and December 2, 2022, VELASQUEZ was the
associated traveler in a gray 2007 Chevrolet Tahoe with
California license plate number 7NDH235 (the "SUBJECT VEHICLE").
GOMEZ is also recorded in three of four crossings as an
associated traveler.  Additionally, on May 8, 2023, VELASQUEZ
and GOMEZ crossed the U.S.-Mexico border driving a burgundy
Lexus ES350 with California license plate number 6CWM419.

D.  **LAPD Confidential Informant Identifies GOMEZ**

26.  LAPD investigators in this investigation have been
working together with a Confidential Informant ("CI")[12] -- who is
intimately involved with SANCHEZ, GOMEZ, and the drug

---

[12] The CI has been reporting to the LAPD since approximately
the fall of 2023 and is not being paid for assisting law
enforcement in the investigation.  The CI's information has been
reliable thus far.  The CI has a criminal history with two
misdemeanor convictions for disturbing the peace and driving
under the influence.  The CI is believed to be cooperating in
hopes of receiving a reduced sentence related to the instant
investigation.

trafficking organization.  During a meeting with Detective Kaminski, the CI indicated one of SANCHEZ's primary sources of supply is an individual who goes by the name of "Teo."  The CI confirmed "Teo" is active in facilitating, orchestrating, and trafficking narcotics as recently as January 2024.

27.  On or about January 10, 2024, the CI was provided the California Driver's license photograph of GOMEZ, and positively identified him as the "Teo" who is SANCHEZ's source of supply of narcotics.  Further, the CI provided a phone number ending in 9301 as the most recent phone number GOMEZ utilized to contact them on December 29, 2023.  The CI also provided the following past numbers used by GOMEZ: the number ending in 7666 (associated with "Teo" contact in SANCHEZ's phone), the number ending in 1458 (associated with "Pedro" contact in SANCHEZ's phone), and the number ending in 3733 (associated with "Pedro De Pacas" contact in SANCHEZ's phone).

**E.    CI Ships a UPS Package Containing Fentanyl for GOMEZ and VELASQUEZ in January 2024**

28.  In addition to the digital evidence tying GOMEZ and VELASQUEZ to the DTO's drug trafficking activities, VELASQUEZ and GOMEZ have also been observed delivering and facilitating drug sales, including an interstate drug shipment on January 16, 2024, in Los Angeles, described below.

29.  Based on my discussions with HSI SA Salvador and my review of law enforcement reports, I am aware of the following.

a.   On January 16, 2024, LAPD detectives were contacted by the CI regarding the interstate shipping of a package from California to an address in Yonkers, New York.

b.   On January 16, 2024, GOMEZ contacted the CI from the phone number ending in 9301 (the most recent phone number the CI confirmed was GOMEZ) to assist in the presumed shipping of narcotics through the U.S. mail system.  The CI indicated that the CI had experience shipping narcotics in the past and GOMEZ asked the CI for advice on how to package the narcotics for shipping.  GOMEZ ultimately asked the CI if the CI would assist in shipping a package the following day.

c.   On January 17, 2024, the CI agreed to meet with GOMEZ at 1201 Truman Street, San Fernando, CA 91340.  This location is a strip mall which has a shipping business called "City Business Shipping."

d.   Prior to meeting, the CI repositioned to the parking lot of an El Pollo Loco restaurant located next door to City Business Shipping.  LAPD Detectives Kaminski and Asatur Mkrtchyan observed this meeting.

e.   GOMEZ arrived at the meeting as the passenger in the SUBJECT VEHICLE.  LAPD Detectives identified GOMEZ based on a comparison with his DMV photograph.  A DMV inquiry into the vehicle license plate shows the SUBJECT VEHICLE is registered to VELASQUEZ and another individual named Juan Mendoza. LAPD Detectives observed that the driver of the SUBJECT VEHICLE appeared to be VELASQUEZ based on a comparison with her DMV photograph.

f.   Detectives observed GOMEZ exiting the SUBJECT VEHICLE and carrying an apparent toaster oven cardboard box to the CI's vehicle.  GOMEZ placed the box into the rear, passenger side door of the CI's vehicle.  GOMEZ then entered the front, passenger door of the vehicle.

g.   An audio recording shows that while inside the vehicle, GOMEZ instructed the CI to meet him at the Starbucks located on Foothill near the Home Depot after shipping the box to provide the receipt.

h.   After approximately two minutes, GOMEZ exited the CI's vehicle and returned to the SUBJECT VEHICLE with VELASQUEZ. The SUBJECT VEHICLE then exited the south driveway and drove westbound on Maclay Avenue to an unknown location.

i.   The CI then drove to City Business Shipping where they paid $194.63 in cash to ship the box provided by GOMEZ and received UPS tracking number -6449 (the "UPS Parcel").

j.   The CI then drove to the Starbucks located at 12980 Foothill Boulevard, Pacoima, CA and met back up with GOMEZ to provide him a receipt.  GOMEZ exited the SUBJECT VEHICLE, still being driven by VELASQUEZ, and entered the front passenger seat of CI's vehicle.  Inside the vehicle, the CI provided the receipt and tracking number and GOMEZ stated he may have some more "gigs" a little later if the CI wanted to make money.

k.   GOMEZ then re-entered the SUBJECT VEHICLE with VELASQUEZ and the SUBJECT VEHICLE drove out of sight of investigators, and they were not able to maintain surveillance.

15

**F.   Law Enforcement Seize Approximately One Kilogram of Presumptive Fentanyl from the UPS Package**

30.   On January 24, 2024, the Honorable Patricia Donahue, U.S. Magistrate Judge for the Central District of California, signed a federal search warrant in case no. 24-mj-00377, authorizing the search of the UPS Parcel.  That same day, HSI Ventura and LAPD executed the warrant, which resulted in the seizure of approximately 1.09 kilograms of substance that field tested positive for fentanyl.  A lab report confirmed that the drug package within the UPS Parcel contained a net weight of 988.2 grams of fentanyl.

**G.   VELASQUEZ, GOMEZ, and the SUBJECT VEHICLE Travel to the U.S. Southern Border and Mexico**

31.   On January 30, 2024, the Honorable Charles F. Eick, U.S. Magistrate Judge for the Central District of California, signed a warrant in case number 2:24-mj-00484, ordering T-Mobile to provide historical and prospective cell-site information for the phone number ending in 4692 subscribed to VELASQUEZ (the "4692 number").

32.   On February 10, 2024, LAPD investigators analyzed cell-site data provided by T-Mobile and determined that VELASQUEZ's 4692 number appeared to travel on February 10, 2024 from the Los Angeles area to the National City and Otay Mesa area in California near the U.S.-Mexico Border.  Specifically, the 4692 number, arrived in the Otay Mesa area at approximately 10:22 a.m., and then traveled to National City area at approximately 10:42 a.m.  The last ping location data near National City area was registered at approximately 12:02 p.m.

16

In total, the 4692 number appeared to spend approximately one hour and forty minutes in the National City and Otay Mesa area, prior to returning to Los Angeles.  Based on training and experience, investigators believe that this short excursion to National City and back to Los Angeles is consistent with known drug traffickers traveling to cities near the United States-Mexico Border to pick up narcotics arriving from Mexico.

33.  On March 11, 2024, the Honorable Pedro V. Castillo, U.S. Magistrate Judge for the Central District of California, signed a warrant in case number 2:24-MJ-01364, authorizing the installation and use of a tracking device on the SUBJECT VEHICLE.

34.  On April 3, 2024, at approximately 11:40 a.m., I know based on my discussions with SA Salvador, that investigators noticed VELASQUEZ's -4692 number travel to the Santa Monica/Venice Beach area in Los Angeles.  Detective Kaminski responded to the area at approximately 1:45 p.m. and located the SUBJECT VEHICLE, unoccupied in the parking lot located at 2100 Ocean Front Walk.  At approximately 2:30 p.m., Detective Mkrtchyan installed a GPS vehicle tracking device on the SUBJECT VEHICLE.  At approximately 7:11 p.m., the GPS tracker showed that the SUBJECT VEHICLE traveled back to the area of the San Fernando Valley.  At approximately 10:33 p.m., the GPS tracker showed the SUBJECT VEHICLE stopped and parked in front of the SUBJECT PREMISES.

35.  Based on my discussions with SA Salvador, I know the following:

a.   On April 7, 2024, at approximately 7:30 p.m., investigators noticed the SUBJECT VEHICLE and VELASQUEZ's 4692 number travel to the area near the U.S.-Mexico border.  At approximately 10:12 p.m., the SUBJECT VEHICLE arrived at the Cross Border Xpress located at 2745 Otay Pacific Drive, San Diego, CA 92154.  The SUBJECT VEHICLE then left the Cross Border Xpress area at 10:15 p.m.

b.   On April 29, 2024, at approximately 9:41 p.m., the SUBJECT VEHICLE and VELASQUEZ's 4692 number traveled from the SUBJECT PREMISES to the area near the U.S.-Mexico border, arriving at approximately 4:15 a.m., on April 30, 2024.

c.   On March 6, 2024, SA Salvador completed a search utilizing a closed source law enforcement tool of the international border crossings for the SUBJECT VEHICLE and discovered that it had crossed the United States into Mexico on September 20, 2023; August 21, 2023; January 4, 2023; and December 2, 2022.  For all the border crossings, VELASQUEZ was the associated traveler with the SUBJECT VEHICLE and GOMEZ is documented in three of four crossings as an associated traveler.

36.  From my training and experience, I know that the SUBJECT VEHICLE engages in unusual travel patterns based on its short trips to cities near the U.S.-Mexico border, given the lengthy travel time from Los Angeles to the border.  Based on my training and experience and discussions with those involved with investigating narcotics smugglers, the SUBJECT VEHICLE's short trips to near the U.S.-Mexico border and then immediate return

back to the Los Angeles area, despite the lengthy commute between the cities, is consistent with drug trafficking.

**H.    GOMEZ and VELASQUEZ Reside at the SUBJECT PREMISES**

37.  On April 15, 2024, at approximately 8:28 a.m., based on my discussions with HSI SA Salvador, I know that LAPD Detectives were conducting physical surveillance of VELASQUEZ and GOMEZ at the SUBJECT PREMISES.  Detectives observed VELASQUEZ driving the SUBJECT VEHICLE and GOMEZ was sitting in the front passenger seat.  Detective Kaminski observed the SUBJECT VEHICLE drive into the driveway and past the gate of the SUBJECT PREMISES.  Detective Mkrtchyan observed GOMEZ exit the SUBJECT VEHICLE and close the gate at the front of the driveway of the SUBJECT PREMISES.

38.  On April 18, 2024, LAPD Officer Zarazua conducted a special flight over the area of the SUBJECT PREMISES, taking 10 photographs of the location and surrounding area.  In one of the aerial photographs, the SUBJECT VEHICLE can be seen parked in front of the SUBJECT PREMISES.



I.  **GOMEZ and VELASQUEZ are Likely Engaged in Additional Drug Trafficking**

a.  May 7, 2024: McDonald's Exchange

39.  Based on my discussions with HSI SA Salvador, I know that on May 7, 2024, at approximately 3:21 p.m., investigators learned that the SUBJECT VEHICLE traveled from the SUBJECT PREMISES to a McDonald's fast food restaurant at 12860 Encinitas Avenue, Sylmar, CA 91342.  This trip was noteworthy due to the short duration of time spent at the McDonald's (approximately four minutes from 3:20 p.m. to 3:24 p.m.) and the fact the SUBJECT VEHICLE traveled to this specific McDonald's restaurant, which was located outside of the typical travel range and pattern of the SUBJECT VEHICLE, and past several McDonald's restaurants closer in proximity to the SUBJECT PREMISES.

40.  Detective Kaminski responded to the McDonald's restaurant and spoke with a manager, who provided Detective Kaminski access to the video surveillance system.  Prior to viewing the video footage, Detective Kaminski verified the date and time stamp were accurate.

41.  Upon viewing the footage, Detective Kaminski observed the SUBJECT VEHICLE pull into the parking lot at approximately 3:20 p.m. and park.  At approximately 3:21 p.m., a small silver KIA SUV drove into the parking spot directly to the right of the SUBJECT VEHICLE.  GOMEZ immediately exited the front passenger seat of the SUBJECT VEHICLE and entered the rear driver seat of the KIA SUV.

42.   At approximately 3:23 p.m., GOMEZ exited the rear
driver seat of the KIA SUV and re-entered the front passenger
seat of the SUBJECT VEHICLE.

43.   At approximately 3:23 p.m., the SUBJECT VEHICLE exited
the McDonald's parking lot.  At approximately 3:26 p.m., the
silver KIA SUV exited the McDonald's parking lot.

      b.   <u>May 8, 2024: Travel Inn Motel Exchange</u>

44.   On May 8, 2024, at approximately 7:52 p.m., based on
my discussions with HSI SA Salvador, I know that the SUBJECT
VEHICLE and VELASQUEZ's -4692 number traveled from the SUBJECT
PREMISES to the Travel Inn Motel at 8525 Sepulveda Boulevard,
North Hills, CA 91343.  The SUBJECT VEHICLE was at the motel for
approximately 20 minutes before leaving.

45.   The following day, on May 9, 2024, Detective Kaminski
responded to the motel and met with the staff, who provided him
access to surveillance camera footage.  Prior to reviewing the
video footage, Detective Kaminski verified the date and time
stamp were accurate.  Detective Kaminski reviewed several
different camera angles at the location and observed the
following:

      a.   At approximately 8:10 p.m., the SUBJECT VEHICLE
entered the parking lot of the Travel Inn Motel.  The SUBJECT
VEHICLE parked at the southwest corner of the center building
structure of the Travel Inn Motel.

      b.   At approximately 8:25 p.m., an unidentified
female exited from room #306 and unlocked a silver Kia Sportage
parked approximately two spots away from the SUBJECT VEHICLE.

GOMEZ exited the front, passenger seat of the SUBJECT VEHICLE and retrieved a duffle bag.  GOMEZ then carried the duffle bag to the trunk of the Kia Sportage and placed it into the trunk. GOMEZ then re-entered the SUBJECT VEHICLE in the front passenger seat, and the SUBJECT VEHICLE drove away from the Travel Inn Motel.

46.  Based on my training and experience, and discussions with other law enforcement officers versed in drug trafficking investigations, this conduct is consistent with drug trafficking activity where participants engage in quick encounters in public areas to quickly discuss drug transactions or exchange contraband and/or money.

### J.   GOMEZ and VELASQUEZ Conduct a Drug Deal at a T.J. Maxx Department Store Parking Lot

47.  Based on my discussions with HSI SA Salvador, I know the following:

a.   On May 13, 2024, at approximately 1:21 p.m., LAPD Detectives Kaminski, Mkrtchyan, and Albert Shinfeld were conducting physical surveillance near the SUBJECT PREMISES.  At this time, the detectives observed the GPS tracker on the SUBJECT VEHICLE depart from the SUBJECT PREMISES.  The detectives then observed the SUBJECT VEHICLE being driven by VELASQUEZ with GOMEZ in the front passenger seat.  Detectives followed the SUBJECT VEHICLE to a T.J. Maxx Department Store parking lot at 1651 N Victory Place, Burbank, CA 91502. Detectives observed GOMEZ, VELASQUEZ, and an infant child exit the SUBJECT VEHICLE and enter T.J. Maxx.

b.    Approximately five minutes later, GOMEZ exited the T.J. Maxx by himself and approached the SUBJECT VEHICLE. GOMEZ unlocked the door via the front driver seat, and then walked around to the front passenger door, opened the door and reached deep into the SUBJECT VEHICLE.  When GOMEZ reappeared, he was holding a clear plastic bag, which contained a white and neon green Litom LED solar landscape light box.  GOMEZ appeared to be communicating on his cellphone and began walking around the parking lot, as if looking for someone.

c.    Detectives observed a black Toyota Highlander SUV with Nevada license plate No. 441F80 (the "BLACK TOYOTA") pull up to the area where GOMEZ was standing.  At approximately 1:55 p.m., GOMEZ entered the rear passenger door of the BLACK TOYOTA while still holding the white and green box.  Upon exiting the BLACK TOYOTA, GOMEZ was no longer holding the white and green box.  GOMEZ walked back in the direction toward the T.J. Maxx store.

d.    Upon witnessing this conduct, detectives transitioned their surveillance and attention to the BLACK TOYOTA and contacted Burbank Police Department ("BPD") for assistance.  BPD Sergeant Case and Mirakyan followed the BLACK TOYOTA and initiated a traffic stop at Glenoaks Boulevard and Roscoe Boulevard.

e.    Upon coming to a stop, the front passenger fled from the BLACK TOYOTA on foot carrying a black bag with a white and green box protruding from the bag.  While fleeing, the suspect jumped over a fence, dropping the bag and the white and

green box.  During the pursuit, Sergeant Mirakyan observed what
he believed to be a one-pound package of narcotics that appeared
to fall to the ground while the subject was fleeing.  After
taking the suspect into custody, BPD recovered the white and
neon green Litom LED solar landscape light box, which was open.
The open white and green box was found on the ground,
approximately 10-15 feet away from the suspected package of
narcotics that was wrapped in a brown tape.

   f.  BPD ultimately arrested the three individuals in
the BLACK TOYOTA.  BPD recovered a black bag, the white and neon
green Litom LED solar landscape light box (which was now open),
and seven individually packaged plastic bags of various weights
that were suspected to contain narcotics.  Two of the seven
packages (including the package recovered from the ground near
the open white and green box) were wrapped in brown tape.  The
white and green box appeared to be the same box that GOMEZ took
from the SUBJECT VEHICLE and brought into the BLACK TOYOTA.

   g.  On May 14, 2024, SA Salvador contacted BPD and
took custody of the items connected to GOMEZ and VELASQUEZ
(i.e., the white and green box and the two brown packages of
suspected narcotics).  SA Salvador seized the white and green
box with markings advertising a Solar Landscape Light, and two
plastic bags individually wrapped in light brown tape.  The
plastic bags field tested positive for methamphetamine using a
TruNarc handheld device and weighed approximately 1.07
kilograms.




### K.   The SUBJECT VEHICLE and SUBJECT PREMISES Are Likely Used for Drug Trafficking Activities

48.   Based on my discussions with law enforcement officers and my review of law enforcement reports, I know that GOMEZ and VELASQUEZ use the SUBJECT VEHICLE as their primary vehicle. Based on their review of GPS data from the vehicle tracker, investigators know that the SUBJECT VEHICLE does not travel in a predictable or consistent manner, typical of a daily routine or a daily set pattern of life.  Instead, as described herein, GOMEZ and VELASQUEZ appear to use the SUBJECT VEHICLE for quick encounters in public areas (such as the May 7, 2024 McDonald's exchange, May 8, 2024 Travel Inn Motel exchange, and May 13, 2024 T.J. Maxx drug deal), which is consistent with drug trafficking activity.  Furthermore, the SUBJECT VEHICLE has also made trips to the U.S.-Mexico border, which as described herein, is consistent with drug smuggling activity.

49.  Furthermore, as described herein, based on observation of GPS data from the SUBJECT VEHICLE and cell-site data from VELASQUEZ's -4692 number, the SUBJECT VEHICLE (with GOMEZ and VELASQUEZ inside) departs from the SUBJECT PREMISES before making these quick transactions, such as the May 7, 2024 McDonald's exchange and the May 8, 2024 Travel Inn Motel exchange.  In addition, based on GPS data and physical surveillance, investigators know that on May 13, 2024, the SUBJECT VEHICLE departed from the SUBJECT PREMISES before traveling to the T.J. Maxx parking lot where GOMEZ engaged in a drug transaction resulting in the seizure of approximately 1.07 kilograms of presumptive methamphetamine.

### V.  TRAINING AND EXPERIENCE ON ITEMS TO BE SEIZED FROM A CRIMINAL'S RESIDENCE, VEHICLES, STORAGE LOCATIONS, AND PERSON

50.  Based on my training and experience, I know that people involved in criminal activities store evidence of their criminal activities, and the proceeds from their criminal activities, at various locations over which they exercise dominion and control.

51.  A criminal's residence, business, storage, garage, vehicle and on their person are some of the primary locations I have found evidence of criminal activity.  In this regard, I know that:

a.  People involved in criminal activities often maintain evidence, including those items I have listed in Attachment B, at their residences and/or at locations of individuals they trust, so that they have fast and convenient

access to items.  Further, because people involved in criminal activities are unlikely to store the bulk of their assets (proceeds from criminal activities and valuable stolen property, such as firearms) in safe locations like banks, they are able to protect their assets by keeping them close at hand in places like their residences, garage, vehicles, and/or person. Additionally, individuals involved in criminal activity and those who are attempting to evade law enforcement will often utilize residences of individuals they trust.  These individuals know that locations linked to them will likely attract law enforcement.

b.   People involved in criminal activities maintain books, records, customer's lists, receipts, notes, ledgers (often referred to as "pay/owe" sheets) and other papers, for extended periods of time, relating to acquisition and distribution of assets from their illegal activities, including firearms.  People involved in criminal activities also maintain addresses, telephone numbers, and contact information for co-conspirators, particularly in cases involving the illegal sales of firearms.

c.   People involved in criminal activities often must maintain, on hand, large amounts of money to maintain and finance their ongoing criminal activity, and as a result of their ongoing criminal activity, to include drug trafficking, debt collection, extortion and firearms sales, and firearms trafficking.

d.   People who are involved in criminal activities often securely store their illegal proceeds, (cash, currency and financial instruments or documents of monetary value) as well as firearms, inside a 'safe' which can be location inside of a person's residence or other area on the premises.

e.   People who are involved in criminal activities often have P.O. boxes where they receive information that is evidence of their criminal activities.

f.   People involved in criminal activities often use vehicles to transport contraband, ill-gotten gains, fruit of the crime and evidence, including the items listed in Attachment B.

52.   People involved in criminal activities often maintain evidence of their criminal activities on their computers, cellular telephones, and other digital devices.  They do this because these devices can hold substantial amounts of information in very compact locations.  Further, storing evidence of criminal activities on digital devices such as cellular telephones, computers, iPads etc. provides an advantage to the criminals as they are often able to lock the devices and protect the evidence of criminal activity from being observed by law enforcement officer.

## VI. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

53.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on

29

their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry

Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[13]

54. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

e.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress GOMEZ's and/or VELASQUEZ's thumb and/or
fingers on the device(s); and (2) hold the device(s) in front of
GOMEZ's and/or VELASQUEZ's face with his or her eyes open to
activate the facial-, iris-, and/or retina-recognition feature.

57.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VIII.   <u>NIGHTTIME SERVICE</u>

58.  I request that the Court authorize investigators to
serve this warrant during the nighttime, as set forth under Fed.
R. Crim. Proc. 41(e)(2)(A)(ii).  Good cause for nighttime

service exists because of the heightened risk of violence posed
by the Drug Trafficking Organizations ("DTO") that are
associated to the Mexican drug cartels and their associates.
GOMEZ has a previous arrest for Carrying a Loaded Firearm in
Public, is believed to source his narcotics from Mexican DTOs,
and is believed to be engaged in selling narcotics and
firearms.  In addition, a previous search warrant of one of
GOMEZ's associates (SANCHEZ) within the DTO resulted in the
seizure of two assault rifles and a stolen handgun, all within
close proximity of narcotics.  Due to the GOMEZ's patterns of
movements and conduct when engaging in his drug transactions, I
believe he understands the tactics, rules, and laws that control
law enforcement's investigative activities, including that law
enforcement typically executes search warrants at 6:00
a.m.  Sunrise will be at 5:47 a.m. on the planned date of the
execution of the search warrant, and the ability to serve the
requested warrants at night will provide law enforcement with a
better opportunity to enter the property without incident to
ensure the safety of law enforcement, any occupants of the
SUBJECT PREMISES, and any residents of the area.

59.  Good cause for nighttime service also is supported by
the unique geography of the SUBJECT PREMISES, as reflected in
the photos in Attachment A-1.  The SUBJECT PREMISES sits at the
foot of a wooded hillside.  The house itself is setback
approximately 50-75 yards from the front metal gate at the
entrance to the lot.  Between the front gate and the main house,
there appears to be a large open grassy area with sheds,

vehicles, and other outdoor structures.  Because of this sprawling layout, law enforcement is concerned that normal service will create a heightened risk of both danger to officers, as well as flight or destruction of evidence by the targets.  Specifically, the large amount of open wooded space surrounding the premises allows the targets to potentially become armed and to fortify their position against law enforcement as soon as they become aware of law enforcement's presence, and the amount of space and numerous points of egress will make it difficult for law enforcement to secure the premises, rule out any threats before entry, and/or respond to lurking threats upon or after entry.  In addition, because of the time it will take for law enforcement to move past the front metal gate, this will give the targets additional time to flee and/or destroy evidence such as drugs.  Given these facts, I respectfully submit that nighttime service is warranted in this case.

## IX. <u>CONCLUSION</u>

60.  For all of the reasons described above, there is probable cause to believe that GOMEZ has committed a violation of 21 U.S.C. §§ 841(a)(1): Distribution of a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES, SUBJECT VEHICLE, and the persons of GOMEZ and VELASQUEZ, as described in Attachments A-1, A-2, A-3, and A-4.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>20</u>th day of May
2024.

_____
HONORABLE STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE